IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:08-CV-420-D

| | | |
|---|---|---|
| SETH DAVIS, | ) | |
| | ) | |
| Plaintiff/Claimant, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross-motions for judgment on the pleadings. Claimant Seth Davis seeks judicial review of the Commissioner's denial of his applications for Supplemental Security Income and Disability Insurance Benefits. After a thorough review of the record and consideration of the briefs submitted by counsel, it is recommended that Claimant's Motion for Judgment on the Pleadings [DE-20] be denied and Defendant's Motion for Judgment on the Pleadings [DE-22] be granted.

## STATEMENT OF THE CASE

Claimant filed applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) on March 23, 2006. (R. 96-105.) Claimant alleges that he became unable to work on September 7, 2005, due to numbness; weakness in his legs, hands, and arms; neck pain; and a ruptured disc in his cervical vertebrae. (R. 119.) Prior to the alleged onset date, Claimant had done ground maintenance; worked as a cook, laborer, nursery operator at a hog farm, screen printer, and shipper; and had served as a vehicle mechanic in the Army. (R. 34-38, 120.)

The Commissioner denied Claimant's applications initially and on reconsideration. Thereafter, Claimant timely requested a hearing and appeared before an Administrative Law Judge ("ALJ") on November 21, 2006. (See R. 27-51.) In a decision dated February 15, 2007, the ALJ found that Claimant was not under a "disability" as defined in the Social Security Act and therefore not entitled to benefits. (R. 16-26.) On April 3, 2008, the Appeals Council denied Claimant's request for review, rendering the ALJ's decision a "final decision" for purposes of judicial review. See Walls v. Barnhart, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying ALJ decision becomes the agency's final decision for purposes of appeal). Claimant timely commenced the instant action pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW AND SOCIAL SECURITY FRAMEWORK

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through application of the correct legal standards. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of

the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. See Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. See 20 C.F.R. §§ 404.1520 and 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the ALJ determines whether the claimant has a severe impairment or combination of impairments which significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled per se.

If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry his burden through the testimony of a vocational expert ("VE"), who testifies as to jobs available in the economy based on the characteristics of the claimant.

In this case, Claimant alleges that the ALJ erred in his decision by: (1) failing to adequately evaluate Claimant's medical records and articulate the basis for the denial;

3

(2) rendering improper pain, credibility, and RFC assessments, and (3) relying on an improper hypothetical question posed to the VE.

## **FACTUAL HISTORY**

### I.  The ALJ's Findings

In making the decision in this case, the ALJ proceeded through the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920.  The ALJ first found that Claimant had not engaged in substantial gainful activity at any time relevant to the decision.  (R. 21.)  At step two, the ALJ determined that Claimant suffered from four "severe" impairments–degenerative disc disease of the cervical spine, degenerative joint disease of the lower extremity, diabetes mellitus, and obesity--which imposed more than a minimal limitation on Claimant's ability to perform basic work activities.  (R. 21-22.)  See 20 C.F.R. §§ 404.1520(c).  At step three, the ALJ determined that Claimant's impairments did not, alone or in combination, meet or medically equal one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (R. 22.)

The ALJ next determined Claimant's RFC by considering all of his subjective complaints and reviewing the medical evidence.  A state agency doctor completed an RFC assessment and opined that Clamant could perform a full range of medium work activity.  (R. 194-201.)  The ALJ rejected this assessment, in part, finding that it did not fully account for some of Claimant's impairments and limitations.  (R. 25.)  Instead, the ALJ found that Claimant could perform a limited range of medium work and that he retained the RFC "to lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk for six hours total in an 8-hour work day with normal breaks, and sit for about six hours total in an 8-hour work day [with restrictions]."  (R. 23.)  The ALJ additionally explained that Claimant

4

would not be able to do work requiring the climbing of ladders, ropes, or scaffolds; or any tasks that would expose Claimant to hazards such as unprotected heights and dangerous equipment. (Id.) The ALJ noted inconsistencies between the medical evidence and Claimant's statements concerning the intensity, persistence, and limiting effects of his conditions. (R. 25.) The ALJ found significant disparities between Claimant's statements and the objective medical evidence, particularly records indicating significant improvement of Claimant's cervical spine condition following surgery. (Id.)

Applying Claimant's RFC as found by the ALJ, the VE testified that Claimant would be able to perform his past relevant work as a screen printer and shipping clerk. Therefore, at step four, the ALJ found that Claimant was capable of performing his past relevant work. (Id.) See 20 C.F.R. §§ 404.1565 and 416.965. As a result, the ALJ found that Claimant was not under a "disability," as defined in the Social Security Act, from the alleged onset date through the date of the decision. (Id.)

## II.    The Administrative Hearing

### A.    Claimant's Testimony at the Administrative Hearing

Claimant testified at his administrative hearing. (R. 32-46.) He was 51 years old on the alleged onset date. At the hearing, Claimant testified that he was living in his sister's home with his wife, daughter, and granddaughter. (R. 32-33.) Claimant finished high school, attended community college for one semester, and served in the United States Army for four years as a vehicle mechanic. (R. 34-35.)

Claimant detailed his substantial and varied work history. (R. 34-37.) In addition to his Army service as an mechanic, Claimant worked in ground maintenance, ran a concrete mixer and performed cleanup tasks with a construction company, worked in the shipping

5

department of a chicken processing plant, immunized and fed baby pigs on a hog farm, and worked as a screen printer. (R. 34-37; see R. 120.)

Claimant testified that he lost his ability to perform any of these jobs when he lost his normal ability to use his right hand and arm. (R. 37.) He also asserted that he was unable to walk more than 10-20 feet without problems and required the use of a cane. (R. 38.) Claimant attributed his physical problems to pain and numbness remaining after surgery he had to address a ruptured disc in his neck and spine. (R. 38-39.) Claimant's attorney also questioned Claimant about his diabetes and his obesity, though Claimant did not believe these conditions affected his mobility. (R. 39-40.)

Claimant asserted that he experienced pain all day, and that medicine "ease[d] the pain" but did not completely alleviate it. (R. 42.) He could only stand for fifteen minutes at a time before he needed to sit down due to back pain. (R. 44.) Claimant's sleep was also interrupted by pain. (R. 45.) Claimant testified that he needed to sit in a chair with his feet up or lie down for three-and-a-half to four hours after taking his pain medication. (R. 43.) Claimant also described activities he used to do, such as barbecuing, gardening, and fishing, but he testified that he was not able to do these things after he stopped working. (R. 42.) He asserted that his legs and back hurt when he rode in a car. (R. 43-44.) Claimant explained that he only left the house on three days in a typical week. (R. 44.)

6

### B.  Vocational Expert Testimony

Kimberly Engler testified as a vocational expert at Claimant's hearing. Ms. Engler described Claimant's past work as a construction worker, screen printer, shipping clerk, and livestock laborer. (R. 47.) The ALJ asked two hypothetical questions of Ms. Engler. First, he asked her to identify jobs that could be performed by an individual of the same age, education, and work background as Claimant who was limited to work requiring him to lift and carry 50 pounds occasionally and 25 pounds frequently, stand or walk for about six hours in an eight-hour day with normal breaks, and sit for about six hours total in an eight-hour day. (R. 47-48.) The ALJ also stated that the hypothetical Claimant would be unable to climb ladders, ropes, or scaffolds, and would need to "avoid exposure to hazards such as unprotected heights and dangerous equipment." (R. 48.) Ms. Engler responded that this individual could perform the work of a screen printer or shipping clerk. (Id.) The ALJ then asked Ms. Engler to consider a hypothetical Claimant of the same age, education, and occupational background as Claimant with the limitations described by Claimant in his hearing testimony. Specifically, the ALJ noted that this hypothetical Claimant would be able to sit or stand and walk for only about 15 minutes, sit for two hours total, and take three or four-hour rest breaks where he could recline and elevate his feet. Ms. Engler opined that such an individual could not perform any jobs in the regional or national economies. (Id.)

7

Case 5:08-cv-00420-D   Document 28   Filed 07/10/09   Page 7 of 15

### III. Analysis of Claimant's Arguments

**A. The ALJ adequately evaluated Claimant's medical records and articulated the basis for the denial**

Claimant first argues that the ALJ erred by failing to make the requisite findings of whether Claimant's condition met a Listing. This is simply incorrect. The ALJ explained at length how Claimant's degenerative joint disease failed to meet Listing 1.02 ("Major Dysfunction of a Joint"). Specifically, the ALJ noted that:

> While the claimant does have degenerative joint disease of the lower extremity, he does not have major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint with involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively, as defined in 1.00B2b, or involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively.

(R. 22.) This conclusion is supported by medical evidence in the record. For instance, on January 17, 2006, Claimant went to the emergency room at Wayne Memorial Hospital. The doctor opined that his "strength is symmetrical throughout" and that "he is able to ambulate without distress." (R. 152.) In addition, in a follow up exam completed on January 24, 2006, a doctor noted that Claimant's "neurological exam was essentially normal, and [h]is reflexes were symmetrical," although he had some difficulty with his gait and walking. (R. 155.) Finally, on February 17, 2006, Claimant went to the Fayetteville Veterans Administration Medical Center complaining that he had fallen and had weakness in his arms and legs. (R. 1564-66.) However, after testing, a doctor noted that Claimant's

8

muscle tone, strength and coordination were normal, his sensory exam was unremarkable, with equal and symmetrical deep tendon reflexes. (R. 166.)

The ALJ also explained how Claimant's conditions failed to meet Listing 1.04 ("Disorders of the Spine"). The ALJ concluded:

> The Claimant also does not have a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture, resulting in compromise of a nerve root (including cauda equina) or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, positive straight-leg raising test (sitting and supine), or spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours, or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

(R. 22.) This assessment is supported by medical evidence in the record. On March 7, 2006, Claimant underwent "C4-5 anterior cervical diskectomy and fusion with fibular allograft plate" in order to alleviate severe cervical myelopathy. (R. 186.) However, after the surgery, Dr. Barry Katz, who performed the surgery, noted, "Overall, he is doing very well. His strength is significantly better. He is not having upper extremity symptoms. His incision looks fine." (R. 191.) In addition, Dr. Katz noted in July of 2006, that Claimant's "strength and sensation in his arms and legs is much better," and he suggested only conservative treatment going forward. (R. 203.)

Finally, the ALJ explained why Claimant's diabetes mellitus failed to meet the criteria for Listing 9.08:

9

> Furthermore, the claimant's diabetes mellitus has not resulted in neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station, acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pC02 or bicarbonate levels), or retinitis proliferans.

(R. 22.) This conclusion is supported by evidence in the record. Claimant, himself, testified that he did not think that his diabetes affected his ability to walk or created problems feeling his hands or feet. (R. 39.) In addition, Claimant had normal Hemoglobin A1C and generally normal lab work in January 2006, indicating that he was keeping his diabetes in check with medication. (R. 152, 149.)

Furthermore, the ALJ noted that he had taken Claimant's obesity into account and found that this condition, alone and in combination with other impairments, failed to meet or equal a Listing. (Id.) Claimant, too, testified that his obesity did not affect his ability to get around; "I'm pretty sure that [obesity] doesn't affect anything." (R. 40.) Summarizing, the ALJ found, "The claimant does not have an impairment or combination of impairments that meets or medically equals [a Listing]." (Id.) Because the ALJ exhaustively reviewed the criteria necessary for a finding of disabled under Listings 1.02, 1.04, and 9.08, and engaged in the necessary analysis in determining that Claimant's impairments were not severe enough to equal those listings, the court rejects Claimant's first argument.

Next, Claimant asserts that the ALJ failed to consider all the information in the file that supported his claim. He states, "[T]he treating and examining physicians all came down on the side of Mr. Davis being found disabled" (Claimant's Br. at 7), but he fails to cite to any specific instance of a treating or examining physician's opinion that might have weighed in favor of a finding of disability. Upon a thorough review of the medical records,

10

the court finds that, contrary to Claimant's assertions, the notes from his treating physicians do not suggest that Claimant was disabled. The record is replete with evidence from Claimant's doctors showing positive progress through treatment and the absence of significant abnormalities found through diagnostic testing. For instance, Dr. Terry A. Grant, who saw Claimant in the emergency room, noted that his laboratory workups were normal, that he "looks well to me" and that he did not need emergency intervention. (R. 152-53). Doctors at the Mt. Olive Family Medicine Center noted that Claimant's vital signs and other tests were generally normal. (R. 156-57.) Finally, Dr. Katz, as described above, noted the great improvement that Claimant made after his surgery. (R. 190-91; 203-05.) Where Claimant's treating physicians documented serious concerns, they were largely assuaged through additional evaluation or treatment. (See R. 181; 184; 192-93; 203-05.)

The ALJ's decision catalogues the medical records in detail, both the evidence examining and explaining Claimant's severe impairments and records demonstrating the positive results of testing and treatment. (R. 23-25.) In short, substantial evidence supports the ALJ's conclusion that Claimant was not disabled, and the ALJ did not improperly reject or discount any contrary statement or opinion of a treating physician. The court rejects Claimant's second argument along with his unsupported and unfounded assertion that the opinions of "all" of his treating and examining physicians weigh in favor of a finding of disability.

Third, Claimant attacks the ALJ's summary of the evidence and resulting finding that Claimant was relatively well, "when it should [have been] clear that even his surgeon found him to have residual weakness and numbness." (Claimant's Br. at 11.) Claimant does not cite to any medical records to support this assertion. However, it is apparent from the

11

court's review of the evidence that he is referring to treatment records of Dr. Barry Katz, who performed surgery on Claimant in 2006. Prior to the surgery, Dr. Katz indicated that Claimant was experiencing "numbness diffusely in the upper and lower extremities." (R. 192.) Nevertheless, <u>after</u> the surgery, Dr. Katz noted that Claimant was "a lot better than before surgery" and that his severe cervical myelopathy was "improved." (R. 205.) Although Dr. Katz stated that he did not expect Claimant to be "back to normal" right away, and observed that Claimant "still [had] some weakness," even after the surgery, he later noted that Claimant was "significantly better than he was before the surgery" and that "strength and sensation in his arms and legs is much better." (R. 203-04.) Accordingly, the ALJ considered all of the evidence in the record, including the assessments by Claimant's surgeon.

In summary, the court finds that the ALJ properly evaluated the medical evidence in this matter, that substantial evidence supported the decision, and that the ALJ adequately articulated the bases for his decision to find Claimant not disabled.

### B. The ALJ rendered proper pain, credibility, and RFC assessments

Claimant's second argument--framed by Claimant as a combination of the second and fourth arguments noted at the outset of his brief--is that the ALJ rendered a faulty credibility assessment which in turn corrupted his calculation of Claimant's RFC. Claimant presents this argument against the backdrop of an additional, related assignment of error: that the ALJ improperly analyzed evidence of Claimant's experience with pain.

An ALJ performs a two-step inquiry to determine whether a claimant's allegations of pain and limitations are credible. First, the ALJ must determine if there is objective medical evidence that supports the existence of a medical impairment which reasonably

12

could be expected to cause the pain and symptoms alleged. See Hines v. Barnhart, 453 F.3d 559, 564-65 (4th Cir. 2006). In this case, the ALJ determined that Claimant suffered from impairments which could reasonably be expected to produce the symptoms alleged. (R. 25.) Next, the ALJ evaluates a claimant's statements regarding his symptoms. Craig v. Chater, 76 F.3d 585, 596-97 (4th Cir. 1996). This evaluation must take into account a claimant's subjective statements about his pain as well as all available evidence, including the claimant's medical history, medical signs, laboratory findings, objective medical evidence of pain, and other evidence that might shed light on the severity of the impairment, such as evidence of the claimant's activities of daily living, specific descriptions of the pain, and any treatment regimen. Id. at 595. Where the first step in the credibility analysis is met--as it was here--at the second step the claimant's allegations about his pain "may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity." Id. However, the ALJ is not required to accept a claimant's allegations "to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause [the pain alleged]." Id.

In this case, at the second step of the analysis, the ALJ noted inconsistencies between plaintiff's testimony and the evidence in the record. (R. 25.) The ALJ contrasted plaintiff's allegations with "[t]he records of Dr. Katz," which "indicate[d] that the claimant had significant resolution of his cervical spine symptomatology following his surgery," as well as records from Claimant's other treatment providers, which failed to show consistent complaints of problems with standing and walking. (R. 25.)

13

It is not the province of this court to determine the weight of the evidence. Hays, 907 F.2d at 1456. The ALJ thoroughly explained his credibility analysis and how he resolved inconsistencies in the evidence. As a result, the ALJ satisfied his duty under the applicable regulations and law and did not err in finding Claimant not entirely credible. The ALJ's determination of Claimant's RFC was not rendered faulty by any aspect of his credibility determination. The court therefore rejects Claimant's argument and instead finds that the ALJ did not err in his assessment of Claimant's RFC or in finding Claimant's testimony not totally credible.

### C. The ALJ posed appropriate hypotheticals to the VE

Claimant also takes issue with the hypotheticals posed to the VE by the ALJ at Claimant's hearing. Upon review of Claimant's brief, the court concludes that Claimant is not asserting error in either the formulation of the hypotheticals or the VE's responses. Instead, he is simply reasserting his disagreement with the ALJ's reliance on the first hypothetical, in which the ALJ rejected much of Claimant's subjective testimony, instead of the second hypothetical, which presupposed a positive credibility determination. As such, Claimant's third argument rises and falls with his argument related to the ALJ's credibility determination, which was fully discussed and rejected supra Part III.B.

## CONCLUSION

Accordingly, the court **RECOMMENDS** that Claimant's motion for judgment on the pleadings be **DENIED** and that Defendant's motion for judgment on the pleadings be **GRANTED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file

written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 10th day of July, 2009.

_____
DAVID W. DANIEL
United States Magistrate Judge